**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE**

| | |
|---|---|
| **LATIVAFTER LIQUIDATING TRUST,** )<br>Plaintiff, )<br> )<br>v. )<br> )<br>**CLEAR CHANNEL** )<br>**COMMUNICATIONS, INC.,** )<br>Defendant. ) | No. 3:05-CV-578<br>Judge Phillips |

## MEMORANDUM AND ORDER

Plaintiff Eon Streams, Inc.,[1] brought this action against defendant Clear Channel Communications, Inc., for breach of contract, promissory estoppel and negligent misrepresentation. Clear Channel brought a counterclaim against Eon alleging breach of contract and intentional interference with existing or prospective business relationships. The case was tried to a jury over a seven-day period and resulted in a jury verdict in favor of plaintiff on the breach of contract claim and $40 million in damages to plaintiff. The jury rejected defendant's counterclaim. Clear Channel now moves the court for judgment as a matter of law, pursuant to Rule 50(b), Federal Rules of Civil Procedure, or, in the alternative, for a new trial, pursuant to Rule 59(a), Federal Rules of Civil Procedure.

---

[1] Though the style of the case has been changed to reflect that the named plaintiff is Lativafter Liquidating Trust, the parties continue to refer to the plaintiff as Eon Streams, Inc.

1

As grounds for the motion, Clear Channel states that: (1) the record fails to support the jury's finding that the parties entered into a new contract or a contract to amend the Services Agreement; and (2) the record fails to support the jury's finding of $40 million damages for the "depressed value" of Eon Streams.

## **Motion for Judgment as a Matter of Law**

Clear Channel moves the court for judgment as a matter of law pursuant to the provisions of Rule 50, Federal Rules of Civil Procedure. In diversity cases, a state-law standard of review is applied when a Rule 50(b) motion for judgment as a matter of law is based on a challenge to the sufficiency of evidence necessary to support the jury's verdict. *Morales v. American Honda Motor Co.,* 151 F.3d 500, 506 (6th Cir. 1998). In Tennessee, a motion for judgment notwithstanding the verdict is the state-law equivalent of a federal motion for judgment as a matter of law. Tenn.R.Civ.P. 50.02; *Mairose v. Federal Exp. Corp.,* 86 S.W.3d 502, 510-11 (Tenn.App. 2001).

In considering a motion for judgment notwithstanding the verdict, a Tennessee court is required to "take the strongest legitimate view of the evidence in favor of the non-moving party, and allow all reasonable inferences in his favor." *Id.* Judgment notwithstanding the verdict is proper if, after assessing the evidence, the court determines that "reasonable minds could not differ as to the conclusion to be drawn from the evidence." *Id.*

## Motion for New Trial

Clear Channel also moves for a new trial pursuant to Rule 59 of the Federal Rules of Civil Procedure. In diversity cases, federal law provides the standard of review used in deciding a motion for new trial under Rule 59. *Conte v. Gener Housewares Corp.,* 215 F.3d 628, 637 (6th Cir. 2000). The authority to grant a new trial under rule 59 rests within the discretion of the trial court. A new trial is warranted when a jury has reached a "seriously erroneous result," which may occur when (1) the verdict is against the weight of the evidence; (2) the damages awarded are excessive; or (3) the trial was unfair to the moving party in some fashion (i.e., the proceedings were influenced by prejudice or bias). *See Holmes v. City of Massillon,* 78 F.3d 1041, 1045-46 (6th Cir. 1996). The burden of demonstrating the necessity of a new trial is on the moving party, *Clarksville-Montgomery Co. Sch. Sys. v. U.S. Gypsum Co.,* 925 F.2d 993, 1002 (6th Cir. 1991), and the ultimate decision whether to grant such relief is a matter vested within the sound discretion of the district court. *See Anchor v. O'Toole,* 94 F.3d 1014, 1021 (6th Cir. 1996); *Davis v. Jellico Community Hosp., Inc.,* 912 F.2d 129, 133 (6th Cir. 1990) (limiting a court's responsibility to preventing an injustice); *Browne v. Signal Mountain Nursery,* 286 F.Supp.2d 904, 908 (E.D.Tenn. 2003).

When ruling on a new trial motion claiming the verdict was against the weight of the evidence, the district court should "compare the opposing proofs and weigh the evidence." *Conte v. Gen. Housewares Corp.,* 215 F.3d 628, 637 (6th Cir. 2000); *Toth v. Yoder Co.,* 749 F.2d 1190, 1197 (6th Cir. 1984); *see also J.C. Wyckoff & Assoc. v. Standard Fire Ins. Co.,* 936 F.2d 1474, 1487 (6th Cir. 1991). The court should deny the motion and

leave the jury's verdict undisturbed so long as it "could reasonably have been reached." *See Conte,* 215 F.3d at 637-38. Thus, a motion for a new trial should be denied "if the verdict is one that reasonably could be reached, regardless of whether the trial judge might have reached a different conclusion were he the trier of fact." *Mosley v. Kelly,* 65 F.Supp.2d 725, 739 (E.D. Tenn. 1999), quoting *Powers v. Bayliner Marine Corp.,* 83 F.3d 789, 796 (6th Cir. 1996). A jury's verdict "should not be considered unreasonable simply because different inferences and conclusions could have been drawn or because other results are more reasonable." *J.C. Wyckoff,* 936 F.2d at 1487. Rather, the court must compare the offered evidence and set aside the jury's verdict only if it is against the clear weight of the evidence as a whole. *Webster v. Edward D. Jones & Co.,* 197 F.3d 815, 818 (6th Cir. 1999).

## The Jury's Verdict is Supported by Material Evidence

To prevail on a claim for breach of contract, Eon must show (1) the existence of an enforceable contract, (2) a breach of the contract due to nonperformance, and (3) damages caused by the breach. *See Life Care Centers of America, Inc. v. Charles Town Assocs. Ltd. Partnership, LPIMC, Inc.,* 79 F.3d 496, 514 (6th Cir. 1996).

As to the existence of an enforceable contract, Steve Newman, President and CEO of Eon, testified that he had conversations with Brian Parsons, Vice President of Technology for Clear Channel, about entering into an agreement to provide streaming to Clear Channel. He received an email from Parsons stating that he was the main contact

4

person for Clear Channel and had authority to execute any agreements between the two companies.

Newman testified that in October 2004, he and Parsons discussed the development of ad insertion technology for Clear Channel. Eon prepared the Letter of Agreement (LOA) which set out that Clear Channel agreed to move all its streaming radio stations to Eon by December 31st. Eon was to develop and deliver a network ad insertion program by January 1, 2005, and Eon was to receive a 15 per cent commission on any network advertising sales. The term of the LOA was three years. On October 19, 2004, Parsons sent an email to Eon setting out the deal points. When asked why he sent the email, Parsons responded "because that was the understanding that we reached with Eon." The parties culminated their discussions in a LOA sent to Newman by Parsons via email on October 22, 2004.

Thereafter, Newman met with Jeff Littlejohn, Clear Channel Senior Vice President, who told Newman that they had a deal. Littlejohn testified, via deposition, that Parsons had authority to enter into agreements for streaming, and the agreements did not have to be in writing. Newman further testified that based on the agreement reached with Clear Channel, Eon began developing the ad insertion product based on Parson's and Littlejohn's assurances that the parties had a deal. New employees were hired to work on the project. Eon began developing custom media players, web-based access to real time streaming audience statistics, and data collection. Parsons testified he had weekly or tri-weekly meetings with Eon during development. Eon hired Don Williams to start making

calls for advertising sales. Newman, Williams and Kim Johnson from Clear Channel met with prospective advertising customers such as Mars Candy, Toyota, Lexus, Verizon, American Express, Sprint, Kraft, and Pepsi.

Newman testified that everyone at Clear Channel was moving ahead with the project even though the LOA had not yet been signed by Clear Channel. Parsons repeatedly reassured Newman that Clear Channel was going to sign the LOA. On November 2, 2004, Newman inquired, via email, of Parsons, whether the LOA had been signed by Clear Channel. In January 2005, Newman met with Evan Harrison, the newly hired executive vice president for Clear Channel. Newman explained what Eon had been working on with Parsons and Kim Johnson. Harrison never stated that Eon did not have an agreement with Clear Channel.

Newman further testified that in order to get the best price for Clear Channel for streaming he had to sign a three-year commitment with his providers. With the hiring of new employees and purchase of new equipment to develop the ad insertion program, Eon needed additional venture capital to fund the project. Newman told prospective investors that Eon had a contract with Clear Channel for streaming and advertising.

Newman further testified that Parsons attended Eon's January 2005 board meeting, and told the board members that the LOA was not signed, it is "legal right now, but we have a deal, so nobody has to worry about anything here, we do have a deal." Based on Parson's assurances, Eon was able to obtain venture financing from Southern

Appalachian Fund. During January through March 2005, Eon continued to make advertising sales calls on behalf of Clear Channel, and continued with development of the ad insertion technology. Eon also commenced training for Clear Channel market managers to show them how to use the system.

Newman testified that Parsons became a member of Eon's board of directors in April 2005. Parsons was to receive stock options on Eon stock for his work on Eon's board. Eon presented evidence that at the April 27, 2005 meeting of the Eon Board, Brian Parsons stated that Clear Channel was committed to executing the contract (LOA of October 2004) upon Eon's delivery of two items. Newman testified that Eon did in fact deliver the two items that week.

Newman testified that at the July 2005 meeting of Eon's board of directors, Parsons, for the first time, acknowledged the need for the LOA to be signed by Clear Channel, but assured Eon's board that a written contract would be sent that day. However, in September 2005, Parsons informed Newman that Clear Channel had signed an agreement with another services provider, Akamai, but would continue to utilize Eon's streaming services. On November 21, 2005, Eon received a letter from Gerrit Meier at Clear Channel terminating the service agreement. Newman testified that Clear Channel represented 85 per cent of Eon's total revenue.

Tom Skelton, Chairman of Eon's board of directors, testified that even though the contract had not been signed by Clear Channel in October, 2004, the parties had been

7

operating under its terms for some time. When Clear Channel hit various levels of volume, it asked for volume discounts, and Eon gave Clear Channel volume discounts. Clear Channel asked for deliverables that had been promised and were delivered. He further testified that there were "stacks of emails that memorialized the contract, even though it literally didn't have an inked signature on it."

Brian Parsons, Vice President of Technology for Clear Channel, testified that he signed the original contract with Eon for streaming services. The contract for streaming services did not include selling advertising for Clear Channel, or developing ad insertion software. He discussed with Newman that Clear Channel would not make money on streaming until the ad insertion problem was solved. Clear Channel needed to find a way to play commercials on the stream. In 2004, he determined that Clear Channel needed its own solution that worked with its radio station systems. He talked with Newman at Eon about developing ad insertion technology for Clear Channel. Following their discussion, Eon prepared the proposed LOA of October 2004 to develop media players and ad insertion technology. Clear Channel agreed to move all streaming radio stations within its network to Eon. The term of the LOA was three years.

Parsons changed one of the terms in the LOA, to make Eon the preferred streaming provider, as opposed to the exclusive provider, because Clear Channel had existing streaming agreements that needed to run out before moving some stations to Eon. Eon was to receive 15 per cent commission on any network sales. He sent a revised LOA to Eon on October 22, 2004. Before signing the LOA, Parsons was asked by his superiors

to get additional bids on the cost of streaming. He testified it was the only question raised about the LOA by his superiors.

Grady Vanderhoofven, Eon board member, testified that at the January 2005 board meeting of Eon, Parsons stated that the agreement with Clear Channel was in final legal review and that the business terms were all agreed. He had no doubt that there was an agreement between Eon and Clear Channel. The LOA stated that Eon was to receive a 15% commission, that Eon was to be the preferred streaming partner, and that Eon was to develop ad-insertion technology.

Based on the evidence presented at trial, It was reasonable for the jury to find that Eon and Clear Channel entered into a new contract, or a contract to amend the Services Agreement. The jury could reasonably infer that the October 2004 LOA was an "offer," that Parsons expressed Clear Channel's willingness to execute that document upon the delivery of two items (the "acceptance"), which items Eon delivered and which delivery Parsons reported to his superiors and upon which the parties acted.

Further, the jury heard evidence that both Eon and Clear Channel performed under this agreement. The jury heard evidence that after October 22, 2004, Eon developed the FastAim technology, and Clear Channel's emails showed that it was using FastAim and making changes to it. Newman and Williams from Eon went on sales calls for Clear Channel to sell advertising, and Clear Channel was moving more radio stations over to Eon as the preferred streaming provider.

The jury also heard evidence that Clear Channel breached the LOA on September 9, 2005, when it signed an agreement with Akamai for that company to replace Eon as Clear Channel's exclusive streaming provider. Clear Channel also made Ronning Lipset their exclusive third-party advertising sales representative. Because Clear Channel reflected 85% of Eon's cash flow, the jury could reasonably infer that Clear Channel's breach would irreparably damage Eon.

As to the damages suffered by Eon, Tom Skelton, Chairman of Eon's Board of Directors, testified that Eon was forced out of business by Clear Channel's breach. Grady Vanderhoofven testified that Eon's value would have been $57 million with the Clear Channel business and that it sold for $17 million without the business, a difference of $40 million. As Executive Vice President of Southern Appalachian Fund, Vanderhoofven conducted due diligence on Eon in the beginning of 2005. Vanderhoofven examined detailed financial projections, detailed historical financials, information that told how much Eon expected to do in the future, how much business Eon had done in the past, how many customers Eon had, who those customers were, and how Eon thought its sales were going to grow with those customers. Vanderhoofven retained a market research firm to verify Eon's market potential. As a result of Southern Appalachian Fund's investment in Eon, Vanderhoofven became a member of the board of directors of Eon in March 2005. Thereafter, he received monthly financial reports from Eon, including income statements, balance sheets and cash flow statements.

Vanderhoofven testified that between June 2004 and June 2005, the number of stations that Eon was streaming increased by over 500 per cent, and the number of people who were receiving the streams increased by 125 per cent. The revenue from Clear Channel started to fall off after June 2005. He understood that there was a directive within Clear Channel to start moving business to somebody other than Eon. Clear Channel ceased doing business with Eon in November 2005.

When Clear Channel terminated the contract with Eon, Vanderhoofven testified he was personally involved in the decision to sell Eon's assets. The two primary assets of Eon were FastAim and the Clear Channel business. He was involved in determining the price for which to sell the company, reviewing documents, and the negotiations. Vanderhoofven's testimony was based on actual facts about Eon of which he had personal first-hand knowledge. He based his testimony that Eon would have been worth $57 million with the Clear Channel business on the revenue that Clear Channel was generating up until the time they discontinued their business, and the projection for the 12-month period of time prior to the sale. His calculations were based on ten times trailing revenue. He further testified that the actual sales for the prior 12 months were diminished by the loss of Clear Channel's business. As his testimony was unimpeached and uncontroverted by Clear Channel, it was reasonable for the jury to accept his testimony about Eon's value both before and after the breach of contract by Clear Channel. Thus, the jury's verdict that Eon suffered $40 million in damages is reasonable and supported by the evidence presented at trial.

Clear Channel argues that the court erred by permitting Vanderhoofven to offer lay opinion testimony as to Eon's damages. Clear Channel further argues that Eon's damages had to be proved by expert testimony, and Vanderhoofven was not qualified as an expert witness at trial. The court finds Clear Channel's argument without merit. As stated by the court at trial:

> As recognized by the rules of evidence, some witnesses can be both a lay witness, a fact witness, an expert witness, and that generally applies to physicians. But in this instance that can very well apply to a situation where you have an individual on your board of directors who has specialized knowledge. Quite frankly, I think, Mr. Bailey, you should have identified this witness as an expert and qualified him as an expert, but that does not prevent him from giving fact testimony in this case. I will allow him to testify as to what he advised the board of directors of Clear – I'm sorry – Eon Streams, what the value of the company should be for negotiating purposes with the buyer of that company. I will allow you to question him as to what he told his board members that was based upon. Otherwise, I will allow him to testify strictly in accord with the comment to the rule, stating that the owner or officer of a business may be permitted to testify as to the value or projected profits of the business, and that this is based upon not his experience, training or specialized knowledge, but because of his particularized knowledge that the witness has by virtue of his or her position in the business. If you go beyond that, Mr. Goehler, I will sustain your objection. Okay?

The court's ruling was in accordance with the notes to Fed.R.Evid. 701 which states:

> For example, most courts have permitted the owner or officer of a business to testify to the value or projected profits of the business, without the necessity of qualifying the witness as an accountant, appraiser, or similar expert. *See, e.g., Lightning Lube, Inc., v. Witco Corp.,* 4 F.3d 1153 (3rd Cir. 1993) (no abuse of discretion in permitting the plaintiff's owner to give lay opinion testimony as to damages, as it was based on his

12

> knowledge and participation in the day-to-day affairs of the business). Such opinion testimony is admitted not because of experience, training or specialized knowledge within the realm of an expert, but because of the particularized knowledge that the witness has by virtue of his or her position in the business.

Fed.R.Evid. 701, advisory commission notes.

Clear Channel's argument ignores this authority. Vanderhoofven testified from personal knowledge of Eon's financial matters. In *Lightning Tube,* the Third Circuit permitted an owner to testify under Rule 701 about lost profits and future damages based upon his review of the company's records. The court affirmed an award of damages based on this lay opinion testimony. Based on Vanderhoofven's extensive personal knowledge of Eon's business and financial affairs, the court finds that Vanderhoofven's testimony was properly admitted under Rule 701.

Clear Channel elected not to introduce evidence to rebut Vanderhoofven's testimony. Clear Channel designated three persons to provide expert testimony at trial to rebut Eon's damage claims – Evan Harrison, Gerrit Meier, and Jerry Kersting. Clear Channel did not call Kersting as a witness at trial and, while Clear Channel called Harrison and Meier as witnesses, it did not ask either witness about Eon's damages. Moreover, prior to trial, Clear Channel moved to disqualify Eon's counsel, Herbert Sanger, on grounds including that Sanger was a necessary witness on the issue of Eon's damages. At trial, Clear Channel called Sanger as a witness, but asked no questions regarding Eon's damages. Since Clear Channel offered no evidence material to the issue of damages, its argument that the jury's verdict is against the weight of the evidence is without merit.

Viewing the record as a whole, assessing each of the witnesses' credibility, and examining the content and detail of their testimony, the court is unable to conclude the jury's verdict is a "seriously erroneous result," *See Holmes,* 78 F.3d at 1046-47, or runs contrary to the "clear weight of the evidence." *See J.C. Wyckoff,* 936 F.2d at 1487 (stating a jury's verdict "should not be considered unreasonable simply because different inferences and conclusions could have been drawn or because other results are more reasonable"). Accordingly, the court will deny Clear Channel's motion for judgment as a matter of law under Fed.R.Civ.P. 50 (b), and motion for a new trial under Fed.R.Civ.P. 59.

**Prejudgment Interest**

Eon moves the court for an order amending the judgment to include prejudgment interest at the rate of 10% per annum, from the date of Clear channel's breach, September 9, 2005 through December 13, 2007. Clear Channel opposes the motion.

In a diversity action, the question of prejudgment interest must be determined under state law. *Daily v. Gusto Records, Inc.,* 14 Fed. Appx. 579, 591 (6th Cir. 2001); *Glens Falls Ins. Co. v. Danville Motors, Inc.,* 333 F.2d 187 (6th Cir. 1964). Under Tennessee law, there is a presumption in favor of prejudgment interest. Tennessee Code Annotated § 47-14-123 provides, in relevant part:

> Prejudgment interest, *i.e.,* interest as an element of, or in the nature of, damages, as permitted by the statutory and common laws of the states as of April 1, 1979, may be awarded by courts or juries in accordance with the principles of equity at any rate not in excess of a maximum effective rate of ten

14

> percent (10%) per annum . . . . In addition, contracts may expressly provide for the imposition of the same or a different rate of interest to be paid after breach or default within the limits set by § 47-14-123.

The Tennessee Supreme Court has held that, under § 47-12-123, "a court must decide whether the award of prejudgment interest is fair, given the particular circumstances of the case." *Myint v. Allstate Ins. Co.,* 970 S.W.2d 920, 927 (Tenn. 1998). In reaching an equitable decision, a court "must keep in mind that the purpose of awarding the interest is to fully compensate a plaintiff for the loss of the use of funds to which he or she was legally entitled, not to penalize a defendant for wrongdoing." *Id.* Though courts traditionally have awarded interest in cases where the amount of the obligation is certain and the existence of the obligation is not disputed on reasonable grounds, "the uncertainty of either the existence or the amount of an obligation does not mandate denial of prejudgment interest." *Id.* at 928. The Tennessee Court of Appeals found that *Myint* "shifted the balance to favor awarding prejudgment interest whenever doing so will more fully compensate plaintiffs for the loss of use of their funds," and concluded that "fairness will, in almost all cases, require that a successful plaintiff be fully compensated by the defendant for all losses caused by the defendant, including the loss of use of money the plaintiff should have received." *Scholz v. S.B. Int'l, Inc.,* 40 S.W.3d 78, 83 (Tenn.App. 2000).

Here, the proof at trial showed that Eon's demise was assured when Clear Channel breached the parties' contract on September 9, 2005. Thus, the date the prejudgment interest accrues is September 9, 2005. Under Tennessee law, prejudgment interest in a breach of contract case accrues upon breach or default. *Southeast Drilling*

15

*and Blasting Services, Inc., v. Hu Mac Contractors, LLC,* 2003 WL 22055964 (Tenn.Alpp. 2003). As to the rate of prejudgment interest, Clear Channel argues the rate of interest should be the federal post-judgment interest rate rather than the statutory maximum of 10%. Considering the historically low interest rates during the time of the dispute, 10% appears to this court to be punitive. Instead, the court finds that the interest rate to be applied should be consistent with actual interest rates during the relevant period. On average, the prejudgment interest rate between September 9, 2005 and December 14, 2007 was 4.666%.[2] This appears reasonable to the court. Accordingly, plaintiff's motion for prejudgment interest is **GRANTED,** whereby plaintiff is awarded prejudgment interest from the date of breach of the contract and the date of the verdict in this case. Said prejudgment interest shall be at the rate of 4.666% from September 9, 2005 through December 14, 2007.

## **Conclusion**

For the reasons stated above, Clear Channel's motion for judgment as a matter of law or, alternatively, for a new trial [Doc. 200] is hereby **DENIED** in its entirety. The jury verdict is **AFFIRMED.**

Eon's motion for prejudgment interest [Doc. 196] is **GRANTED**, whereby Eon is awarded prejudgment interest at the rate of 4.666% from September 9, 2005 through December 14, 2007.

---

[2] *See* http://www.utd.uscourts.gov/documents/judgpage.html.

Eon's motion to modify the stay of execution [Doc. 219] is **DENIED.**

Clear Channel's motion for leave to file a sur-reply [Doc. 223] is **DENIED AS MOOT.**

**IT IS SO ORDERED.**

ENTER:

s/ Thomas W. Phillips
United States District Judge